# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT JACKSON

## OCTOBER 1997 SESSION



**FILED**

**January 12, 1998**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

| | |
|---|---|
| **STATE OF TENNESSEE,** | ) |
| Appellee, | ) C.C.A. No. 02C01-9702-CR-00054 |
| | ) |
| | ) Shelby County |
| V. | ) |
| | ) Hon. Jon Kerry Blackwood, Judge |
| **JOHN PARKER ROE,** | ) |
| | ) (First Degree Murder) |
| Appellant. | ) |
| | ) |

FOR THE APPELLANT:

Wayne Emmons
2502 Mt. Moriah Rd., A100
Memphis, TN 38115

Edward Witt Chandler
Chandler Law Firm
2502 Mt. Moriah Rd., A100
Memphis, TN 38115

FOR THE APPELLEE:

John Knox Walkup
Attorney General & Reporter

Deborah A. Tullis
Assistant Attorney General
Cordell Hull Bldg., 2d Floor
425 Fifth Avenue North
Nashville, TN 37243

William L. Gibbons
District Attorney General

Thomas D. Henderson
Karen Cook
Assistant District Attorneys General
Criminal Justice Complex, Suite 301
201 Poplar Avenue
Memphis, TN 38103

OPINION FILED: _____

**AFFIRMED**

**PAUL G. SUMMERS,**
Judge

**O P I N I O N**

The appellant, John Parker Roe, was convicted by a jury of first degree murder for killing his wife, Lisa Michelle Trainor Roe. Judge Jon Kerry Blackwood sentenced the appellant to life in prison. On appeal, the appellant presents eight issues for our review:

1. Whether the evidence was sufficient regarding premedi- tation and deliberation and sanity.

2. Whether the trial judge as the thirteenth juror should have set aside the guilty verdict of first degree murder as to the elements of premeditation and deliberation.

3. Whether the indictment should have been dismissed on the grounds of double jeopardy under the Fifth Amendment of the United States Constitution and Article I, Section 10 of the Tennessee Constitution.

4. Whether the trial court should have denied the appellant's use of expert witness testimony because the appellant refused to discuss the facts of the killing with the state's psychologist.

5. Whether the state should have been allowed to proceed with a "death-qualified" or "conviction-prone" jury over defense objection that there was no aggravating circumstance, specifically torture.

6. Whether the jailhouse conversation between the appellant and his friend should have been suppressed on the grounds that it was illegally intercepted in violation of Title III of the Omnibus Crime Control and Safe Streets Act, as well as the Fourth Amendment to the United States Constitution.

7. Whether the testimony regarding Michelle Roe's state of mind should have been admitted over the defense's objection.

8. Whether a mistrial should have been granted after the testimony of Penny Mays.

After carefully reviewing the record before us, we affirm the appellant's conviction.

FACTS

John Parker Roe, a Memphis police officer, shot his wife of two years, Lisa Michelle Trainor Roe, in the early morning hours of Friday, September 16, 1994, at their home in Shelby County. Michelle, a student at Shelby State Community College, died as a result of a gunshot wound to the head.

During the spring of 1994, Daniel Kaltreider attended a barbecue in which Michelle and John Roe were present. Sometime during this barbecue, the appellant and Kaltreider, who had not met before, engaged in a conversation. The appellant told Kaltreider that he had a tremendous amount of anger toward his wife and that he kept track of her by checking her odometer. The appellant then stated, "I'm gonna kill her, do you think I could get away with it if I said it was an accidental discharge?" Kaltreider replied, "No, I'll have to testify against you in open court." When the appellant then threatened to kill Kaltreider, Kaltreider replied, "I fail to see the humor in that." The appellant then mentioned something about an artery and said, "Well, I'll just have to play crazy for about seven--six months." Kaltreider replied, "No, you'll have to play crazy a lot longer than six months, and by the time you get finished, you will be crazy." Because he wanted to give the appellant the benefit of the doubt, Kaltreider did not report this conversation to the Memphis Police Department. However, upon learning of Michelle Roe's death, he reported his conversation with the appellant to the Shelby County District Attorney's office.

Later that same year, around June or July of 1994, the appellant called a friend of his, John "Jay" Barnette, and asked him to come to his house. He told Barnette that he and Michelle had been in a fight. He stated that he was afraid she was going to leave him, so he asked Barnette to come over to help calm the situation down. The appellant told Barnette that he had handcuffed Michelle to the bed to prevent her from leaving him. Shortly thereafter, he saw Michelle sitting on the bed with her right hand tied to the bed and her face in her lap. When he saw her face, Barnette could tell she had been crying.

The appellant had previously told Barnette that he and Michelle fought a great deal and that he had thought about killing her. Also, the appellant told Barnette that he had choked her before and had thought about choking her to death. Barnette further testified that he and the appellant frequently engaged in conversations about killing people and disposing of their bodies. Barnette stated that the appellant had talked about killing Michelle and her parents. The appellant told Barnette that he thought Michelle was lying to him and he would check her odometer and follow her to school. Barnette even accompanied the appellant several times when he followed Michelle.

On September 14, 1994, two days before she was killed, Michelle approached Peter Connelly, one of her teachers at Shelby State Community College, and told him that her husband had abused her and had threatened to kill her. She asked him to call her parents if she did not come to class on Friday. She wrote her parents' phone numbers on a piece of paper and gave the paper to Connelly.

The next day, September 15, 1994, was the appellant's birthday. He had taken the day off from work. At approximately 11:00 p.m., the appellant began a five-hour telephone conversation with a fellow police officer from the Memphis Police Department, Carl Fowler. It apparently was not uncommon for the appellant to engage in lengthy telephone conversations. During this conversation, the appellant indicated to Fowler that he believed Michelle had lied to him about a wedding gift. At trial, Fowler testified that nothing occurred during the conversation which would indicate that anything was wrong. The phone conversation ended around 4:00 a.m. because Fowler was getting tired and the appellant told him that he needed to wake Michelle up for an early class. Except for the appellant, no one knows what occurred at the Roes' home between the hours of 4:00 a.m. and 7:00 a.m.; but Michelle Roe was killed by

John Roe during this period of time.

According to Fowler, the appellant telephoned and asked him to come to his house around 7:00 a.m. When he arrived at the appellant's house around 8:00 a.m., the appellant answered the door, and Fowler attempted to go into the house. However, the appellant blocked the doorway. Fowler asked the appellant three times about Michelle, and after Fowler asked him the third time, the appellant admitted that he shot her, pointing to a bloodstain on the knee of his sweatpants. According to Fowler, the appellant was not wearing a shirt or shoes, only sweatpants. At first, the appellant told Fowler that he had been rabbit hunting with Michelle and had accidentally shot her in the head with his service weapon. The appellant also told Fowler that Michelle was in the bottoms. Fowler told him that they had to call the police, and the appellant irately responded "No."

Meanwhile, Catherine Trainor, Michelle's mother, had received a telephone call from her husband saying that Michelle had not arrived at school. Mrs. Trainor, who was at work, tried to call Michelle at her home, but the telephone was busy. She then asked a friend at work to drive her to Michelle's house. When they arrived at the house around 8:30 a.m., Michelle's car, the appellant's truck, and another vehicle unfamiliar to Mrs. Trainor were in the driveway.

Mrs. Trainor walked up to the front porch and saw the appellant and another man standing on the porch. The appellant introduced Mrs. Trainor to Carl Fowler. The appellant told Mrs. Trainor that Michelle had gone to school. Mrs. Trainor then told the appellant that she had received a call from someone telling her that Michelle had not shown up for school. The appellant told her that Michelle's friend Amy had taken her to school, but Mrs. Trainor knew that the appellant was lying. Amy was the one who called to say that Michelle was not at

school. Because she felt that something was wrong, Mrs. Trainor left to get help.

Fowler told the appellant that he was leaving to call the police, and the appellant said okay. Fowler came upon a motorcycle police officer, William Hughes, as he was driving to a store to call the police. As Fowler was talking to the officer, Mrs. Trainor arrived and spoke with Officer Hughes as well. Mrs. Trainor waited there while the situation at her daughter's house was investigated. Officers returned later and told her that her daughter was dead.

Officer Hughes called for backup, and once Officer Scott Chambers arrived as backup, the two officers went to the appellant's house. When they arrived, the appellant, who had been wearing only sweatpants when Fowler left to get help, was now dressed in blue sweatpants, a white t-shirt, and tennis shoes and was sitting on the tailgate of his truck drinking from a glass. The appellant, who responded to questions by the officers, appeared to be under some stress and was sweating a great deal.

Officer Chambers searched the house while Officer Hughes stayed with the appellant. Officer Chambers found Michelle dressed in her white uniform lying on the bed. A towel had been draped over the top of her head. When Officer Chambers came out of the house, he and Officer Hughes searched the appellant for weapons, handcuffed him, and informed him of his Miranda rights.

The paramedics arrived, but they were unable to get a heartbeat from Michelle. One of the officers asked paramedic Randall Rhodes to examine the appellant because he had been sweating profusely. The appellant told Rhodes that he had not been taking any drugs, but had been under a great deal of stress lately. Although the appellant's vital signs were somewhat high, they were normal for an excited situation. Although Rhodes did not recommend that the

-6-

appellant be taken to a hospital, the appellant was taken to Memphis Medical Center Hospital. There, he was observed by Major Clyde Keenan, a watch commander with the Memphis Police Department, who was called to the hospital because a Memphis police officer had been arrested. He testified that the appellant was lying in the back of the car, halfway on the seat and halfway on the floorboard. He testified that the appellant appeared to be "over the edge" and had "sort of a wild look about him."

The appellant was taken from the hospital to the Criminal Justice Center in Memphis where he met with his attorney, Thomas Hansom. Hansom testified that the appellant "appeared to be unable to communicate" and "if he [the appellant] did respond in any way it was not coherent."

Elton Douglas, a Shelby County jailer, also testified that he observed the appellant for five days on a "suicide watch." He stated that when asked a question, the appellant would mumble a response. The jailer also testified that since the time when the appellant was first brought to the jail, the appellant's behavior had changed. He could now ask him a question and get an answer.

Larry Graham, a friend of the appellant's, went to visit him in jail. Because there was a glass window separating Graham from the appellant, the two had to communicate by telephone. Graham testified that while the two were talking, the appellant put down the phone and indicated to Graham that he wanted him to retrieve a bag that was hidden behind the appellant's house. Although Graham tried to find the bag, he was unable to do so and told the appellant. Approximately one week after Graham searched for this bag, the Sheriff's Office called him and asked him to answer some questions about the bag. Graham told the sheriff that the appellant had asked him to look for the bag and that the appellant had told him that he had accidentally killed Michelle.

-7-

Steve Scott, a firearms identification expert with the Tennessee Bureau of Investigation, testified that the bullet that killed Michelle was fired from the appellant's service weapon and that the gun and all safety features were in operating condition.

Dr. O.C. Smith, assistant medical examiner, performed the autopsy on Michelle Roe.  He testified that the cause of death was a gunshot wound to the right temple.   Dr. Smith also noted that the victim had a bruise on the inside of her left wrist and the backs of her elbows had abrasions, as if they had been scraped over a carpet.  Dr. Smith also observed abrasions below Michelle's lower lip that occurred after her death.  Dr. Smith further determined from the pattern of blood spatters on the headboard of the bed that Michelle was sitting up when she was shot, although the appellant disputes this assertion.   However, when Dr. Smith first saw Michelle, she was fully clothed and was lying on the bed with both feet on the bed.

## SUFFICIENCY OF THE EVIDENCE

In his first issue, the appellant argues that the evidence was insufficient as to premeditation and deliberation and sanity.  Therefore, his conviction should be reversed or reduced to second degree murder.

The state argues that the evidence is sufficient.  It contends that because the appellant admitted to killing his wife, the only issue for the jury to determine was whether the killing was a result of premeditation and deliberation.  The state asserts that the jury could infer premeditation from the appellant's use of a gun against an unarmed victim and that the appellant acted deliberately by arranging the victim's body on the bed, by calmly telling Fowler that he had shot Michelle, by calmly telling Michelle's mother that Michelle was at school, and by getting fully dressed after Fowler left to get help.  Also, the state contends that the

appellant executed his plan to shoot Michelle and then claimed that it was an accident and that he was insane. The state insists that the appellant was unable to raise a reasonable doubt as to his sanity.

A jury found the appellant guilty of murder in the first degree, which at that time was defined as "[a]n intentional, premeditated and deliberate killing of another." Tenn. Code Ann. § 39-13-202 (Supp. 1994). A premeditated act is "one done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-201(b)(2) (1991). A deliberate act is "one performed with a cool purpose." Tenn. Code Ann. § 39-13-201(b)(1).

Great weight is accorded jury verdicts in criminal trials. Jury verdicts accredit the state's witnesses and resolve all evidentiary conflicts in the state's favor. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983); State v. Banes, 874 S.W.2d 73, 78 (Tenn. Crim. App. 1993). On appeal, the state is entitled to both the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832 (Tenn. 1978). Moreover, guilty verdicts remove the presumption of innocence, enjoyed by defendants at trial, and replace it with a presumption of guilt. State v. Grace, 493 S.W.2d 474 (Tenn. 1973). Appellants, therefore, carry the burden of overcoming a presumption of guilt when appealing jury convictions. Id.

When appellants challenge the sufficiency of the evidence, this Court must determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307 (1979); Tenn. R. App. P. 13(e); State v. Duncan, 698 S.W.2d 63 (Tenn. 1985). The weight and credibility of a witness' testimony are matters entrusted exclusively to the jury as the triers of fact. State v. Sheffield, 676 S.W.2d 542 (Tenn. 1984); Byrge v. State, 575 S.W.2d 292 (Tenn. Crim. App. 1978).

The appellant admitted to killing his wife. Several months before he killed her, the appellant told a total stranger, Daniel Kaltreider, that he was going to kill his wife and claim that it was an accident or that he was insane, which the appellant eventually did. Also, the appellant told Jay Barnette that he had thought about killing Michelle by choking her to death, and Barnette and the appellant had engaged in several conversations about how to kill people and then dispose of their bodies. The appellant stated to Barnette the possibility of killing Michelle and her parents. On the day that he killed Michelle, the appellant talked calmly to Michelle's mother, to police officers Hughes and Chambers, and to paramedic Rhodes. The appellant changed clothing after Officer Fowler left to get help.

The jury chose to accredit the state's witnesses on the issues of premeditation, deliberation, and sanity. Based upon the record before us, we see no evidence requiring us to disturb the jury's verdict. The evidence is sufficient. Therefore, this issue is without merit.

THIRTEENTH JUROR

In his second issue, the appellant argues that the trial judge, as the thirteenth juror, should have set aside the guilty verdict of the jury because the evidence was insufficient to prove beyond a reasonable doubt the appellant's sanity. Although the appellant concedes that the trial judge approved the jury's verdict when he ruled on motion for new trial, he still contends that the trial court committed error. In his brief, he asserts that "[t]he trial judge did not set forth any facts or make any findings sufficient to justify this approval and this was error and the conviction should be reversed. . .." Therefore, the appellant contends

that his conviction should be reversed or reduced to second degree murder. The state argues that the trial judge did perform his role as thirteenth juror by approving the jury's verdict. The state asserts that the trial judge was not required to place on the record his findings of fact.

Rule 33(f) of the Tennessee Rules of Criminal Procedure provides what is commonly referred to as the "thirteenth juror" rule:

> (f) New Trial Where Verdict Is Against the Weight of the Evidence.-- The trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence. If the trial court grants a new trial because the verdict is contrary to the weight of the evidence, upon request of either party the new trial shall be conducted by a different judge.

The appellant argues that the trial judge committed error by not making any findings on the record. The proper inquiry is not whether the trial court made any findings on the record, but whether the trial court unequivocally found the evidence sufficient to support the conviction. The appellant even concedes that the trial judge approved the jury's verdict when he ruled on the appellant's motion for new trial. During the hearing for a new trial, the trial judge stated, "[a]s the thirteenth juror, the Court accepts the verdict."

Once the trial court approves the verdict as the thirteenth juror and imposes judgment, the review of the evidence on appeal is quite limited, requiring the accrediting of the testimony of the witnesses for the state and the resolution of evidentiary conflicts in favor of the state. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). The trial judge neither equivocated on whether the evidence was sufficient nor expressed dissatisfaction with the judgment. See State v. Dankworth, 919 S.W.2d 52 (Tenn. Crim. App. 1995). Therefore, this issue is without merit.

DOUBLE JEOPARDY

-11-

Third, the appellant argues that the indictment should have been dismissed on the grounds of double jeopardy. He asserts that he was "punished twice:" once by the Memphis Police Department by terminating his employment and again by prosecution of the first degree murder charge. The state argues that loss of employment does not constitute punishment. It maintains that the appellant was fired from his job as a police officer because he violated the policies of the Memphis Police Department, not because he killed his wife.

We must agree with the state that loss of employment from one's job, while undoubtedly disturbing, is not "punishment" as contemplated for double jeopardy purposes. This issue is without merit.

TRIAL COURT'S DENIAL OF EXPERT TESTIMONY

Next, the appellant argues that the trial court erred in denying the defense the testimony of expert witnesses at trial because the appellant refused to discuss the facts of the killing with the state's psychologist. The appellant filed notice of his intention to use insanity as a defense. He contends that his use of pills called Mini-Thins caused him to suffer from "toxic psychosis." The appellant argues that the state's psychologist, Dr. Lynne D. Zager, routinely testified for the state in criminal cases and was a "personal friend" of Tom Henderson, the prosecutor in this case. Furthermore, the appellant argues that he refused to make a statement about the facts of the case to Dr. Zager, rather than refusing to be examined.

The state argues that the trial court properly excluded expert witness testimony by defense experts regarding insanity. The state asserts that this issue is waived because the record on appeal does not contain the preliminary hearing transcript upon which the trial court based its decision to exclude expert witness testimony. Nevertheless, the state addressed this issue in its brief and

-12-

argued that the trial court properly excluded expert testimony by the appellant pursuant to Rule 12.2(d) of the Tennessee Rules of Criminal Procedure. The state maintains that the appellant, who on advice from counsel, refused to cooperate with Dr. Zager on three separate occasions. Thus, the trial court subsequently found that the appellant had willfully failed to comply with its order that he submit to a psychiatric evaluation by the state's expert and denied the appellant the use of expert witnesses.

Although the preliminary hearing transcript is not included in the record, the order denying expert testimony entered by Judge Lafferty[1] is part of the record before us. Rule 12.2(c) of the Tennessee Rules of Criminal Procedure provides:

> (c) Mental Examination of Defendant.-- In an appropriate case the court may, upon motion of the district attorney, order the defendant to submit to a mental examination by a psychiatrist or the other expert designated for this purpose in the order of the court. No statement made by the defendant in the course of any examination provided for by this rule, whether the examination be with or without the consent of the defendant, no testimony by the expert based upon such statement, and no other fruits of the statement shall be admitted in evidence against the defendant in any criminal proceeding except for impeachment purposes or on an issue respecting mental condition on which the defendant has introduced testimony.

Rule 12.2(d) of the Tennessee Rules of Criminal Procedure states:

> (d) Failure to Comply.--If there is a failure to give notice when required by subdivision (b) of this rule or to submit to an examination when ordered under subdivision (c) of this rule, the court may exclude the testimony of any expert witness offered by the defendant on the issue of the defendant's mental condition.

The appellant raised the issue of sanity, yet wanted the court to, in effect, tie the hands of the prosecutors by not having the appellant submit to a mental examination. The appellant argues that he did not refuse to be examined, just not to discuss the "facts of the case" with the state's psychologist. Rule 12.2(c) clearly protects the appellant's constitutional rights. The appellant made the decision not to comply with Rule 12. He cannot now complain that he was in any

---

[1]Judge Blackwood was designated to hear this case after Judge Lafferty suffered a medical emergency.

way prejudiced. The state, like the appellant, is entitled to a fair trial. <u>State v. Livingston</u>, 607 S.W.2d 489 (Tenn. Crim. App. 1980). This issue is without merit.

DEATH-QUALIFIED JURY

In his next issue, the appellant presents a twofold argument that the jury selection process violated his constitutional rights: the state engaged in misconduct by seeking the death penalty based upon an aggravating circumstance that it knew it could not prove and consequently, acquired a "death-qualified" or "conviction-prone" jury, which prejudiced the appellant. Although the appellant sought a clarification of the aggravating circumstance upon which the state based its decision to seek the death penalty, the state never revealed the nature of the aggravating circumstance until after the appellant was found guilty of first degree murder. The appellant contends that

the state wanted to prejudice the jury in its favor by getting a "death-qualified" or "conviction-prone" jury.

The state argues that the decision to seek the death penalty was within the discretion of the prosecutor. In seeking the death penalty, the state attempted to prove the aggravating circumstance of torture through alleged instances of spousal abuse. The state insists that the appellant has not shown how the state's decision to seek the death penalty based upon an aggravating circumstance of torture was "based upon anything other than the facts of this crime."

In addressing the appellant's argument on this issue, we begin first with his contention that he was prejudiced by the selection of a "death-qualified" or "conviction-prone" jury. The appellant provides no evidence to support his contention that a death-qualified jury prejudiced him. Furthermore, as the state

-14-

correctly notes in its brief, the United States Supreme Court and the Tennessee Supreme Court have both found that a death-qualified jury could apply the law to the facts. See Lockhart v. McCree, 476 U.S. 162 (1986); State v. McKay, 680 S.W.2d 447 (Tenn. 1984). Thus, we conclude that this issue is without merit.

Next, with regard to the appellant's contention of prosecutorial misconduct, we must agree to some extent. A prosecutor's duty encompasses far more than securing a conviction. His or her role is

> not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. . . . He [she] may prosecute with earnestness and vigor--indeed, he [she] should do so. But, while he [she] may strike hard blows, he [she] is not at liberty to strike foul ones. It is as much his [her] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

Berger v. United States, 295 U.S. 78 (1935). See also State v. Spurlock, 874 S.W.2d 602, 611 (Tenn. Crim. App. 1993); State v. Smith, 803 S.W.2d 709, 710 (Tenn. Crim. App. 1990).

While we fail to find that the prosecution acted in bad faith, we admonish the state for pursuing the death penalty based upon the aggravating circumstance of torture, which consisted of alleged instances of abuse occurring months before the victim was killed. At trial, the state admitted that it had no legal authority for its position, and conceded its position when questioned by the trial court, which later ruled in favor of the appellant after hearing the evidence provided by the state.

Furthermore, we must note that the state had only one aggravating circumstance, torture, on which it based its decision to seek the death penalty. Our Supreme Court defined torture in State v. Williams, 690 S.W.2d 517, 529 (Tenn. 1985), as "the infliction of severe physical or mental pain upon the victim

while he or she remains alive and conscious." We find it difficult to believe that the prosecutors actually believed that instances of alleged abuse that occurred months before the victim's death could be considered torture as defined by our highest court. Although we conclude that the prosecutors' actions did not affect the verdict in this case, they would be well advised to refrain from using such weak aggravators in future trials.

## INTERCEPTED CONVERSATION

Next, the appellant argues that his jailhouse conversation with his friend Larry Graham was illegally intercepted, thus constituting a warrantless seizure of information. The state, however, asserts that nothing in the record indicates that this conversation was intercepted or how the sheriff's office learned about the context of the conversation, which dealt with hiding a bag of videotapes and sex toys.

The state incorrectly asserts that nothing in the record indicates how the sheriff's office learned about this bag. During the motion for new trial hearing, Lieutenant E. D. Scallions of the Shelby County Sheriff's Department testified that he had received a telephone call from a woman who refused to identify herself. The woman stated to Scallions that she had talked to Larry Graham's wife and that his wife had told her about a conversation between the appellant and Graham. Scallions testified that Graham was then interviewed and the sheriff's department began looking for a bag that had been placed in the vicinity of the appellant's house.

The state is correct, however, in its assertion that the appellant did not offer any evidence that his conversation with Graham had been intercepted. This fact, coupled with what appears to be a logical explanation regarding how the sheriff's department learned of the bag's existence, leads us to conclude that

this issue is without merit.

## STATE OF MIND HEARSAY EXCEPTION

The appellant's next issue concerns the testimony of Peter Connelly, who was one of Michelle Roe's teachers at Shelby State Community College. Connelly testified that two days before she was killed

> Michelle came up to me after class, and she stated to me that her husband had abused her and that her husband had threatened to kill her. And she asked me to call her mom and dad if she did not show up for clinic on Friday. And she wrote down the phone numbers of her mom and dad on this piece of paper.

On appeal, the state argues that Connelly's testimony is relevant and admissible under Tennessee Rule of Evidence 803(3), which is commonly referred to as the "state of mind" hearsay exception. It asserts that Connelly's testimony is admissible to rebut the appellant's assertion in his opening statement that his marriage to the victim was "a good marriage and a happy marriage" and that the appellant and the victim loved each other. The state maintains that because the marital relationship of the appellant and the victim was an issue at trial, Connelly's testimony is relevant.

The appellant, however, argues that Connelly's testimony is not relevant and is "rank hearsay." The appellant asserts that the state is trying to use "the deceased's state of mind to prove the defendant's state of mind." The appellant further contends that Connelly's testimony was "extremely prejudicial with respect to the issue of premeditation and deliberation" because the appellant could not confront the deceased, thereby violating his constitutional rights.

The first step is to determine whether Peter Connelly's testimony is relevant. Tennessee Rule of Evidence 401 states: "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of

consequence to the determination of the action more probable or less probable than it would be without the evidence."

The relationship between the appellant and the victim was an issue at trial. On appeal the state relies solely on the fact that the appellant opened the door by declaring in his opening statement that he and the victim had "a good marriage and a happy marriage." However, other instances of trouble in the couple's marriage also made their relationship relevant at trial. The victim's mother, Catherine Trainor, and Jay Barnette testified that there had been problems in the couple's marriage. Therefore, although the state focuses solely on the appellant's opening statement, the couple's marital relationship would still have been an issue based upon the testimony of these two witnesses. Consequently, we find, as did the trial court, that Connelly's testimony was relevant.

Next, we must determine whether the testimony is hearsay. On appeal, the state argues that Connelly's testimony is admissible under Tennessee Rule of Evidence 803(3), the "state of mind" hearsay exception as some indication of the victim's feelings toward the appellant. The state, however, at trial relied on State v. Howell, No. 03C01-9406-CR-00203 (Tenn. Crim. App. at Knoxville, Feb. 12, 1996), perm. app. denied, concurring in results only, (Tenn. July 8, 1996), arguing that Connelly's testimony of the victim's statements was being offered to prove premeditation and deliberation by the appellant.

Tennessee Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tennessee Rule of Evidence 803(3) states that the following types of statements are admissible as exceptions to the hearsay rule:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent,

plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

The following provides an interpretation of the 803(3) state of mind hearsay exception:

In order for Rule 803(3) to apply, the declarations of mental condition should <u>expressly assert</u> the declarant's mental state. Common examples include statements of love ('I love Karen'), fear ('I'm afraid Adolph will kill me'), and hate ('I hate him'). Many times a statement does not <u>literally assert</u> the declarant's mental state when offered to prove that mental state. If so, the statement should be admitted as nonhearsay.... In any event, both circumstantial declarations of mental state and express declarations of mental state are admissible.

Neil P. Cohen et al., <u>Tennessee Law of Evidence</u> § 803(3).2, at 540 (3d ed. 1995) (emphasis added).

We begin with the fact that the state offered Connelly's testimony at trial for one purpose, to prove the appellant's premeditation and deliberation, yet on appeal, contends that it was offered to rebut the appellant's assertion that he and the victim had "a good marriage and a happy marriage." At trial, the state relied on <u>Howell</u>, which indicates that Rule 803(3) permits a victim's statement to prove the defendant's state of mind. However, Rule 803(3) does not permit such an interpretation. As noted earlier, the state of mind hearsay exception allows the <u>declarant's</u> state of mind to be proven, and no one else's. Therefore, the state erred by relying on <u>Howell</u> to prove premeditation and deliberation by the appellant.

In its brief, the state also incorrectly asserts that Connelly's testimony was admissible under Rule 803(3), the state of mind hearsay exception. <u>Tennessee Law of Evidence</u> in its interpretation of Rule 803(3) states that "[m]any times a statement does not literally assert the declarant's mental state when offered to prove that mental state. If so, the statement should be admitted as nonhearsay." <u>Id.</u> Section 801.7 of <u>Tennessee Law of Evidence</u>, which discusses nonhearsay

declarations to prove circumstantially the declarant's mental state, states that "utterances offered for the underlying implied assertion that is circumstantially implicit in the literal spoken or written words. . . . [are] often viewed as nonhearsay." Id. § 801.7, at 498-99 (emphasis in original); see State v. Goins, No. 03C01-9502-CR-00026 (Tenn. Crim. App. at Knoxville, filed July 30, 1996).

Nowhere in Peter Connelly's testimony is there an express assertion of the declarant's, that is the victim's, mental state. Connelly's testimony does, however, contain statements by the victim that circumstantially imply her mental state toward the appellant at the time the statements were made. The key to determining whether a statement is hearsay is the purpose for which it is offered. Therefore, had the state at trial offered the statements of the victim to rebut the appellant's assertion in his opening statement that he had a good marriage, Connelly's testimony would have been admissible as nonhearsay for a circumstantial implication of the victim's mental state. However, the state did not offer Connelly's testimony for that purpose at trial, but instead offered his testimony of the victim's state of mind to prove the appellant's state of mind as to premeditation and deliberation. This was error. However, because the evidence as to premeditation and deliberation is overwhelming, we conclude that any error was harmless. Tenn. R. Crim. P. 52(a).

MOTION FOR A MISTRIAL

In his last issue, the appellant argues that the trial court erred by not granting his motion for a mistrial. The appellant moved for a mistrial after the testimony of Penny Mays, one of the victim's instructors at Shelby State Community College. She testified that during a conversation she had with Michelle Roe the day before she was killed, Michelle indicated to her that she was fearful, although she did not indicate why or of whom she was frightened.

At trial, the state argued that Ms. Mays testimony was similar to Peter Connelly's testimony in that it showed that in the days preceding the victim's death she was fearful and that she asked Ms. Mays, as well as Mr. Connelly, to call her parents if she did not show up for class on Friday. The defense, however, at trial argued that Ms. Mays testimony "was more general [than Connelly's testimony]--it was much more vague. There was not a threat to kill . . .." The defense moved to have Ms. Mays' testimony stricken, and the trial court agreed. The trial court then instructed the jury to disregard Ms. Mays' testimony.

In his brief, the appellant argues that the trial court could not "unring the bell" by simply telling jurors not to consider the testimony of Ms. Mays once they had heard it. The appellant contends that Mays' testimony was extremely prejudicial regarding the issue of premeditation and deliberation. The state however argues that because the trial judge instructed the jury to ignore Mays' testimony, the jury is presumed to have followed his instructions. Thus, the state maintains that the trial court correctly denied the appellant's motion for a mistrial.

The decision whether to grant a mistrial is within the sound discretion of the trial court. State v. Jones, 733 S.W.2d 517, 522 (Tenn. Crim. App. 1987). The trial judge's decision will not be overturned on appeal unless there was an abuse of that discretion. Id. A mistrial is usually appropriate in a criminal case only where there is a "manifest necessity." Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict. Id. The burden of establishing a "manifest necessity" lies with the appellant.

The appellant conceded at trial that Ms. Mays' testimony was extremely general and vague, yet now argues that her testimony was so prejudicial that a

-21-

mistrial should have been granted.  The trial judge instructed the jury "to disregard the testimony of the last witness, Miss Mays.  You are not to consider that testimony, at all, for any purpose whatsoever.  You can totally disregard that testimony." Based upon the record before us, we conclude that Ms. Mays' testimony did not preclude an impartial verdict by the jury.  Accordingly, this issue is without merit.

### CONCLUSION

After careful consideration of the issues presented by the appellant, we affirm his conviction of first degree murder.


_____
PAUL G. SUMMERS, Judge


CONCUR:



_____
JOHN H. PEAY, Judge



_____
DAVID G. HAYES, Judge